# United States Court of Appeals
## For the First Circuit

No. 21-1104

JENNIFER SALMON,

Plaintiff, Appellant,

v.

ROGER LANG; LINDA HIRSCH; JOHN MOSES; JASON FREDETTE; KURT
MCPHEE; CHELMSFORD SCHOOL COMMITTEE; PATRICIA TOBIN; TOWN OF
CHELMSFORD,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Chief Judge,
Howard, Circuit Judge,
and Singal,* District Judge.

Joseph L. Sulman, with whom The Law Office of Joseph L.
Sulman, Esq. was on brief, for appellant.
Douglas I. Louison, with whom Alexandra M. Gill and Louison,
Costello, Condon & Pfaff were on brief, for appellee.

December 16, 2022

---

* Of the District of Maine, sitting by designation.

**HOWARD, <u>Circuit Judge</u>.**   Jennifer Salmon -- a public school teacher and former president of her local teachers' union -- brought suit against several public school officials, her town, and the local school committee, alleging First Amendment retaliation and state-law claims arising from various negative reactions to her union advocacy efforts between 2016 and 2018. The district court entered summary judgment for all defendants. Salmon now appeals the district court's summary judgment ruling and two other rulings from the pleading and discovery stages.  We affirm.

## I.   BACKGROUND

Salmon has been a public school teacher in Chelmsford, Massachusetts since 2002.  In May 2016, she became president of the Chelmsford Federation of Teachers ("CFT"), a local chapter of the American Federation of Teachers ("AFT").  During her tenure as CFT president, Salmon advocated on behalf of the union regarding classroom-temperature problems in many of the town's school buildings (e.g., cold temperatures during the winter months).  Her advocacy involved an August 2016 meeting with defendant Roger Lang, Chelmsford Superintendent, and email exchanges with certain school principals.  Specifically, Salmon identified these heating issues in emails to defendant Jason Fredette, principal of Byam Elementary, in October 2016, and to defendant Kurt McPhee, principal of McCarthy Middle School, in March 2017.

In September 2017, Salmon began teaching third grade at Harrington Elementary after transferring from a different school. The next month, at the request of colleagues, Salmon raised concerns to the Harrington principal, defendant Patricia Tobin, about working conditions at her new school. The plaints focused on special-needs classrooms and included the need for "increased staffing and improved [student] monitoring." On October 13, 2017, Tobin had a phone call with Salmon about an unrelated matter, in which Tobin "yelled" at Salmon and mentioned that the principal at Salmon's previous school "had warned" Tobin about her. Specifically, Tobin believed that Salmon had interfered with her instructions regarding a school-day scheduling change by telling another teacher that the teacher did not have to listen to Tobin. Tobin later received an email from the CFT vice president about her call with Salmon, which Tobin characterized as "scathing" and found "shocking" and "unfounded." Tobin printed and taped this email to a filing cabinet in her office, feeling that she "needed some time to react to [it]."

In early November 2017, Carol LeRivee, a Harrington first-grade teacher, asked Salmon for help with a special-needs student in her classroom whose disruptive behavior presented safety concerns. LeRivee explained that the child habitually "bolted" out of the classroom and off the playground, which took support-staff members off task and interfered with other students'

classwork. LeRivee had brought these concerns to the administration's attention during the previous month, but felt their response was slow and inadequate. Several teachers, including Salmon, tried to help LeRivee deal with the disruptive child by spending time in LeRivee's classroom to assist with the other children in the class.

On November 16, 2017, Salmon emailed Tobin about this child's behavior and requested a meeting to discuss the attendant concerns. The email copied two non-party administrators -- Amy Reese, Chelmsford Director of Special Education, and Patricia Doherty, Chelmsford Special Education Chairperson -- as well as Rick Blanchet, an AFT field representative. In her email, Salmon noted that "[a]fter reviewing the Major Incident Report Binder, it appear[ed] there are a minimum of 23 major incident reports completed for this student," and that the student's behavior posed a "major safety concern" for the classroom.[1] A few hours later,

---

[1] The Major Incident Report Binder ("MIR Binder") was where teachers filed discipline reports for individual students in the teachers' dedicated folders. At the time of Salmon's email, the MIR Binder was kept in the school's main office on top of a filing cabinet. Under Massachusetts regulations, these discipline reports constitute "student records." See 603 Mass. Code. Regs. § 23.02. As such, access to them was limited to certain "authorized personnel," as defined in applicable regulations. See id. §§ 23.02, 23.07. Salmon contends that the district court improperly found that she was not authorized to view LeRivee's student's file and that this was a material fact in dispute. For the reasons discussed infra, Section II.A.2, we disagree, as the relevant school policy and regulations indisputably prohibited her access in this instance.

- 4 -

Salmon emailed this group again, asking that a meeting be scheduled for Wednesday, November 22 at 8:00 AM between her, Blanchet, and the three school administrators. She added that if Tobin, Doherty, and Reese were unavailable to meet or discuss, her "next step [would be] to go to the [Chelmsford] School Committee with these incident reports."

On November 20, 2017, Tobin met with Salmon in response to her email. Tobin questioned why Salmon felt this was a "union issue," explaining that "the process of working with a student" typically is not, and asked Salmon other questions about her request, i.e., with whom she wanted to meet, and "why and how" she was "able to go into [LeRivee's] classroom to support [her]." Later that day, Salmon again emailed Tobin, Reese, and Doherty, reiterating her request for a meeting at 8:00 AM on November 22 and explaining why she believed that it was a union issue and that she did "not need to ask permission" to enter LeRivee's classroom on her own time. She reiterated that she was "acting as the Union President" in her request to meet on this issue. Tobin responded that same evening, writing that she would be "happy to attend any meeting [Salmon] schedule[d]."

On November 21, Salmon again emailed the three administrators to confirm the meeting schedule. Tobin responded that she would not be available that day, which was the day before Thanksgiving, due to "many classroom visits" on a shortened

- 5 -

schedule.  Reese also emailed Salmon back, explaining that "[t]his is not a union matter" and that she would "not meet with [Salmon] as union president to discuss this student-related matter."  Salmon responded to Reese, reiterating the union's concerns about teacher and student safety, stating that "[Blanchet] will be here at 8am tomorrow," and adding: "Your unreasonable unwillingness to have a conversation about solutions is cowardly."  Later that night, Salmon emailed Superintendent Lang, asking him to "help . . . direct[]" Tobin to meet with her and Blanchet.

On November 22, Salmon and Blanchet entered Tobin's office to request a meeting.[2]  Tobin told them she did not have time to discuss or schedule a meeting, and asked Blanchet to leave.[3] She then left the office to attend to other matters.  Blanchet and Salmon, however, remained.  Upon learning that fact, Tobin directed her support staff to call Lang for assistance.  Following phone conversations between staff members at Harrington and Lang's office, Lang eventually received a message that Blanchet was at

_____

[2] While certain details of this encounter are disputed, such as the tenor of the interaction between Tobin and Blanchet, those details are not material to Tobin's claims or the issues presented on appeal.

[3] In her opposition to the defendants' motion for summary judgment, Salmon contended that there is no evidence that Tobin asked Blanchet to leave.  But this is refuted by Tobin's undisputed deposition testimony that she "told" Blanchet that "he needed to leave."

Harrington and "was becoming . . . agitated and combative toward [Tobin]." Lang then proceeded to Harrington to intervene.

On his way, Lang notified the Chelmsford Police Department that there was an incident occurring at the school. When Lang arrived, he spoke with Tobin and then with Blanchet, who "put his hands on Lang incidental to the conversation." Lang then asked one of the responding police officers to escort Blanchet from the building. Lang returned to speak with Salmon and informed her that he was sending her home for the day in order to de-escalate the situation and investigate the day's events. He assured her that she was not being punished. Salmon went upstairs to her classroom to gather her things. Soon thereafter, Salmon was escorted out of the back of the building by a plain-clothes officer, at Lang's request. Lang had requested the escort because Salmon was visibly upset and the students would soon be arriving. Salmon complied and was driven home by a co-worker.

Later that day, Lang retained outside counsel, on behalf of the Chelmsford School Committee, to investigate the events surrounding the incident. He also placed Salmon on paid administrative leave pending the investigation's outcome. In addition, Lang sent an email to all Harrington parents and staff about the incident and held a meeting with Tobin and Harrington teachers to discuss the same. During the meeting, Lang stated that he was "shocked and disappointed with the actions" of "some

individuals" and that there was "a right way and a wrong way" to bring issues to the administration's attention.[4]

The November 22 incident sparked public commentary and debate among the residents of Chelmsford and some neighboring towns over the weeks that followed. This involved discussion and posts on social media -- including some from defendant John Moses, a School Committee member -- and a "contentious and heated" School Committee meeting held on December 5, which was attended by supporters of both Salmon and the administration. Attendees in support of Lang and Tobin included Fredette and McPhee.

On December 6, the School Committee's outside counsel delivered a report to Lang detailing the findings of the investigation (the "Investigation Report") and sent a letter to Salmon summarizing the same. As detailed in the Investigation Report, the investigation consisted of approximately 23 witness interviews, including those with LeRivee, Salmon, and Tobin, as well as a review of video footage from inside the school, police reports, student incident reports, emails, and various School Committee policies and training materials. Counsel ultimately concluded that Salmon (i) was "insubordinate with regards to [her] appearing for and demanding a meeting that had been previously

_____

[4] Tobin reiterated this sentiment that there was "right way and a wrong way to raise concerns" during a meeting with Harrington teachers in January 2018.

denied by two supervisors," and (ii) had "violated District policy with regards to student records confidentiality" by viewing LeRivee's student's incident reports. Salmon was permitted to return to work the same day.

On December 12, Lang issued Salmon a letter of reprimand to be placed in her personnel file. Lang noted that he concurred with the Investigation Report's findings that Salmon was insubordinate and had inappropriately accessed confidential student information. In March 2018, Salmon took a leave of absence from Harrington and did not return for the remainder of the school year. In the summer of 2018, Salmon sought transfer to several open teaching positions at Fredette's and McPhee's respective schools.[5] She was interviewed and considered, but ultimately not hired. In both instances, hiring committees at each school unanimously decided to hire external applicants over Salmon.

In June 2019, Salmon filed this action against Lang, Tobin, Fredette, McPhee, and the School Committee, alleging violations of the First Amendment, under 42 U.S.C. § 1983, and the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11H. The thrust of her claims was that the defendants retaliated

---

[5] For Fredette's school (Byum Elementary), Salmon applied and interviewed for three positions: second-grade teacher, fourth-grade teacher, and elementary moderate special needs teacher. For McPhee's school (McCarthy Middle), Salmon applied and interviewed for an eighth-grade special education teaching position.

against her in response to her union advocacy, through workplace harassment, disciplinary action, and transfer denials. Salmon also sued Moses for defamation, arising from several social media posts about her involvement in the November 22 incident. In February 2020, Salmon sought leave to amend her complaint to add a new claim against the Town of Chelmsford under the Massachusetts Whistleblower Act ("MWA"), Mass. Gen. Laws ch. 149, § 185, arising from her complaints to school officials of classroom-temperature issues, dating back to 2016, the complaints of working conditions raised to Tobin in 2017, and various adverse actions taken against her from November 22 through her 2018 transfer denials. The court granted her motion to amend only insofar as the new claim was based on alleged adverse actions occurring since February 2018 (within the MWA's two-year statute of limitations period), thus denying Salmon's request for "relation back" under Federal Rule of Civil Procedure 15(c). After discovery, the defendants secured summary judgment on all claims. See Salmon v. Lang, No. 19-cv-11378, 2021 WL 294512 (D. Mass. Jan. 28, 2021). This timely appeal followed.

## II. SUMMARY JUDGMENT RULINGS

We turn first to Salmon's challenges to the district court's entry of summary judgment on her First Amendment-retaliation, MCRA, MWA, and defamation claims. We review summary judgment decisions de novo, affirming only if the record shows "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Stuart v. City of Framingham, 989 F.3d 29, 34-35 (1st Cir. 2021).[6] We evaluate the facts and "draw all reasonable inferences from the record in the light most favorable to the nonmoving party," but "disregard[] any 'conclusory allegations, improbable inferences, and unsupported speculation.'" McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014) (quoting Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014)). We may affirm summary judgment "on any basis apparent from the record." Id.

## A.    First Amendment Retaliation Claims

To prevail on a speech-retaliation claim as a public employee, a plaintiff must prove that (1) she "spoke as a citizen on a matter of public concern," (2) her employer lacked "an adequate justification for treating [her] differently from any other member of the general public," and (3) her "protected expression was a substantial or motivating factor in the adverse employment decision." Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 135 (1st Cir. 2022); see also Alston v. Town of Brookline, 997 F.3d 23, 42 (1st Cir. 2021) (internal quotation marks and citations omitted); McGunigle v. City of Quincy, 835

---

[6] A dispute is "genuine" if "a jury can reasonably interpret the evidence in the non-movant's favor," and a fact is "material" if it is "one that might affect the outcome of the suit under governing law." Reyes-Orta v. P.R. Highway & Transp. Auth., 811 F.3d 67, 73 (1st Cir. 2016) (internal quotes and cites omitted).

F.3d 192, 202 (1st Cir. 2016) (explaining that the second element requires a plaintiff to demonstrate that her interests "'as a citizen, in commenting upon matters of public concern' outweighed [her] employer's interest 'in promoting the efficiency of the public services it performs through its employees'" (quoting Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011)). Salmon's appeal concerns only the third element of this test.

"For purposes of speech retaliation an 'adverse employment [decision]' includes an action the employer takes that would 'deter a reasonably hardy individual from exercising his constitutional rights.'" Gutwill v. City of Framingham, 995 F.3d 6, 12 (1st Cir. 2021) (cleaned up) (quoting Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011)). Whether a plaintiff's protected speech was a "substantial or motivating factor in [an] adverse employment decision . . . is simply a question of causation," and is "analyzed in two steps." Davignon v. Hodgson, 524 F.3d 91, 106 (1st Cir. 2008) (internal quotes and cites omitted). This two-step "causation test" has long been known as "the Mt. Healthy . . . burden-shifting test." See, e.g., Guilloty Perez v. Pierluisi, 339 F.3d 43, 56 (1st Cir. 2003) (referring to Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)); see also Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301-02 (1st Cir. 2014).

Under Mt. Healthy, "the plaintiff must [first] show that the employer would not have taken adverse action but for the plaintiff's speech," through direct or circumstantial evidence of such a causal link. Davignon, 524 F.3d at 106. Then, "[i]f the plaintiff meets that burden, the burden shifts to the employer . . . to sever the causal link." Id. That is, the employer must "prove by a preponderance of the evidence that 'it would have reached the same decision [regarding the adverse employment event] even in the absence of the protected conduct.'" Stuart, 989 F.3d at 35 (quoting Mt. Healthy, 429 U.S. at 287) (alterations in original). "If the employer cannot adduce evidence of an alternative justification . . . or if that evidence, once adduced, does not suffice to prove the point, the employee has established a constitutional violation." Guilloty Perez, 339 F.3d at 51. Conversely, if the employer presents a non-retaliatory reason for the action, "the burden shifts back to the plaintiff to 'discredit [it], either circumstantially or directly, by adducing evidence that [retaliation] was more likely than not a motivating factor." Pierce, 741 F.3d at 302; see, e.g., Stuart, 989 F.3d at 35 (same). Cf. Nieves v. Bartlett, 139 S.Ct. 1715, 1722, 1725 (2019) (discussing the Mt. Healthy test in the context of a retaliatory-arrest case).

Against this backdrop, we begin our examination of Salmon's arguments. She contends that the district court erred in

(i) applying the Mt. Healthy "defense" sua sponte; (ii) concluding that Salmon could not prove causation in her claims against Lang, Fredette, and McPhee; and (iii) concluding that Salmon could not prove Tobin took any adverse employment action against her. We address each in turn.

### 1. Application of Mt. Healthy Burden-Shifting Test

Salmon first contends that the district court erred in applying the Mt. Healthy burden-shifting analysis to her retaliation claim against Lang, arguing that "Mt. Healthy is a defense that must be raised affirmatively by a defendant" and that, here, the defendants failed to do so in both their answers and motion for summary judgment. We disagree.

The sometimes-called "Mt. Healthy defense" is not strictly an "affirmative defense" that is ordinarily waived if not timely pled, under Rules 8(c) and 12(h). See generally Fed. R. Civ. P. 8(c), 12(h). However, even if we were to strictly view the Mt. Healthy defense as an "affirmative defense" under Rule 8, the defendants adequately raised it here. For instance, in their answers, the defendants asserted as an "affirmative defense" that "Plaintiff's claims fail because the Defendant's actions were based on legitimate business reasons and/or business necessity," which Salmon concedes was "arguably a Mt. Healthy-like defense." In their summary judgment brief, the defendants specifically challenged the "causal connection" element of Salmon's retaliation

- 14 -

claims, arguing that Lang's conduct in sending Salmon home was motivated by a desire to "quell the charged atmosphere," and that his subsequent discipline of Salmon was "standard protocol."

These arguments clearly invoke Mt. Healthy burden-shifting to anyone familiar with the doctrine and the defendants cited to caselaw applying it throughout this litigation. See, e.g., Lewis v. City of Bos., 321 F.3d 207, 219-20 (1st Cir. 2003). Thus, Salmon's argument that the district court's analysis under Mt. Healthy constituted "unfair surprise" fails. Given our settled law in this area, Salmon should have been aware that "[t]o qualify for relief," her claims "must survive the burden-shifting enunciated in Mt. Healthy." See, e.g., Pierce, 741 F.3d at 301.

### 2.   No Causation As To Claims Against Lang

Next, Salmon challenges the district court's determination that, under Mt. Healthy, Lang severed the causal link between Salmon's union advocacy and the written reprimand, by showing that the latter was motivated by Salmon's insubordination and unauthorized access of student records.[7]   Salmon specifically

---

[7] Salmon does not appear to specifically challenge the district court's conclusion that Lang's decisions to have Salmon removed from the school building on November 22 and to place her on paid leave were justified by non-retaliatory reasons, i.e., to "minimize distraction to students" and to "facilitate an impartial investigation," respectively. See Salmon, 2021 WL 294512, at *5. Nor does she marshal evidence to discredit these non-retaliatory justifications.  In any event, we agree with the district court that, under Mt. Healthy, Lang was entitled to summary judgment

- 15 -

contends that the court improperly relied on two disputed facts in reaching this conclusion: (i) that Salmon violated the student-record access policy, and (ii) that Tobin was "willing to meet with Salmon, but not on the date requested."[8] We find no error and conclude that entry of summary judgment in favor of Lang was appropriate. The district court's opinion on this point is sound, and we adopt its reasoning; we add only a few points of emphasis in response to Salmon's specific arguments on appeal.

First, Salmon violated the school's confidential-access policy, or so Lang supportably determined. Salmon contends that -- contrary to the district court's finding -- a reasonable jury could find that Salmon was authorized to view LeRivee's student's records, because she was a "staff [member] working with the student" in LeRivee's classroom. We disagree that the record could reasonably support such a finding.

---

insofar as Salmon's retaliation claim relied upon these other adverse actions.

[8] Salmon also argues that the district court erred in describing certain other facts in a light that was unfavorable to her, e.g., that "Blanchet became agitated and combative" during his interaction with Tobin, that he "put his hands on Lang," and omitting that the plain-clothes officer who escorted Salmon from the building had a police badge around his neck. We find no error in the district court's recounting of these facts. In any event, Salmon fails to explain how any of them are material. Indeed, she acknowledges that the district court "did not expressly rely on any of these 'facts'" in its ruling.

The school's policy states that "[o]nly those persons authorized under law and in conformance with these statements of policy and regulation may see a student's file." State regulations provide that only "authorized school personnel shall have access to the student records of students to whom they are providing services, when such access is required in the performance of their official duties." 603 Mass. Code. Regs. § 23.07. "Authorized personnel" is further defined to include two categories of people: (i) teachers, administrators, or service providers "who are working directly with the student in an administrative, teaching, counseling, and/or diagnostic capacity," and (ii) "administrative office staff and clerical support . . . whose duties require . . . access to student records for purposes of processing information for the student record." See 603 Mass. Code. Regs. § 23.02.

Salmon does not adduce any evidence that she was "working directly with [LeRivee's] student in an administrative, teaching, counseling, and/or diagnostic capacity." Thus, there is no basis to conclude that she was "authorized personnel."[9] At best, the record demonstrates that Salmon "checked in with [LeRivee] regularly" and provided classroom-wide assistance to her on a few

---

[9] The second category of "authorized personnel" is plainly inapplicable to Salmon, and she does not make any argument to the contrary.

occasions. This classroom assistance included one instance, during Salmon's lunch break, where she "followed" the student in question after the student had bolted from class, "along with the support staff in that classroom." Moreover, LeRivee told investigators that, when Salmon came into her classroom to help, she "circulat[ed] the room and [was] helping children," and that this happened "three different times." In Salmon's view, she was there "to support a staff member," "acting as the Union President [but] also [as] a teacher and parent in [the] building." But the record is devoid of any evidence that Salmon was ever "working directly" with the student whose incident reports she accessed. This conclusion is bolstered by the Investigation Report, on which Lang relied in disciplining Salmon. The Investigation Report found that Salmon "was not providing any services to [this] student," that she "was not an 'authorized school personnel'" as to that student, and that she therefore "violated student records confidentiality requirements" when she accessed that student's file. Thus, Salmon's assertion that she was authorized personnel, as a "staff [member] working with that student," is not supported by the record. There was no error in the district court's treatment of this undisputed fact. See, e.g., Rossy v. Roche Prods., Inc., 880 F.2d 621, 624 (1st Cir. 1989) (noting that even where proof is based on inferences, summary judgment for defendant may be appropriate where "plaintiff rests merely upon unsupported

allegations" (quoting Méndez v. Belton, 739 F.2d 15, 20 (1st Cir. 1984))).

Second, Salmon asserts that -- contrary to the district court's finding that "Tobin was willing to meet with Salmon, but not on the date she requested" -- a reasonable jury could find that Tobin was "not willing to meet" at all. Again, we not only disagree, but also fail to see how this fact is material. Lang's discipline of Salmon was based, in part, on his finding that she was "insubordinate in [appearing for and] demanding a meeting on November 22 . . . where Ms. Tobin and Ms. Reese . . . had already notified [her] that they were denying [her] request." It is undisputed that Salmon's request was in fact denied. Indeed, Salmon acknowledged these denials herself, in subsequent emails to Reese, Tobin, and Lang. Whether or not Tobin was genuinely willing to meet with Salmon on a later date, as she said she was, has no bearing on the fact that Salmon's request to meet on November 22 had been denied. Nor does it affect the fact that Salmon and Blanchet appeared in Salmon's office on November 22, contrary to Tobin's instruction that there would be no meeting that day. Thus, no reasonable jury could disagree that Salmon appeared for a meeting that her superiors told her was not happening. Lang explicitly based his disciplinary action on this insubordinate conduct, and Salmon has failed to adduce any evidence to discredit that nonretaliatory reason. We find no error in the district

court's treatment of this fact. <u>Cf.</u> <u>Torres-Rosado</u> v. <u>Rotger-Sabat</u>, 335 F.3d 1, 13 (1st Cir. 2003) (affirming summary judgment in First Amendment-retaliation context where "[p]laintiff . . . ha[d] not produced any evidence creating a material issue of fact that she would not have been terminated in any event for insubordination [and] absenteeism").

3. **No Causation As To Claims Against Fredette & McPhee**

Next, Salmon challenges the district court's determination that evidence could not support a causal link between Salmon's union advocacy and the denial of her transfer applications by Fredette and McPhee. Specifically, Salmon contends that this nexus can be inferred from her complaints of heating issues in Fredette's and McPhee's respective buildings, the fact that both of them attended the December 5 School Committee meeting in support of Lang, that neither had ever before passed up an internal transfer applicant in favor of an external hire, and that McPhee violated standard policy in considering Salmon's application together with three external candidates instead of considering hers first. We adopt the district court's reasoning and find no error in its entry of summary judgment in favor of Fredette and McPhee. We again add only a few points of emphasis.

As noted above, to succeed on her retaliation claims, Salmon must introduce enough evidence to support a finding that her union advocacy "was a substantial or motivating factor behind"

the denials of her transfer applications.  See McGunigle, 835 F.3d at 203.  "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured -- the motive must cause the injury."  Nieves, 139 S.Ct. at 1722.  That is, "it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  Id. (citing Hartman v. Moore, 547 U.S. 250, 260 (2006)).  Thus, under Mt. Healthy's burden shifting analysis, Salmon must first show that Fredette and McPhee would not have denied her applications "but for [her] speech."  See Davignon, 524 F.3d at 106.  "Although [Salmon] may rely on circumstantial evidence to make this showing, [she] must produce some facts linking" her transfer denials with her union advocacy.  See McGunigle, 835 F.3d at 203.  Thus, to survive summary judgment, Salmon must have adduced evidence from which a reasonable juror could infer such a link, see id. at 201, but she has failed to do so.

The mere fact that Salmon communicated building-heating concerns to Fredette in October 2016, and to McPhee in March 2017, cannot alone support an inference that either of them acted with a retaliatory motive in denying her transfer applications in June and July 2018.  See, e.g., McGunigle, 835 F.3d at 204 (argument that adverse actions "must have been in retaliation for [plaintiff's] speech because they happened afterwards" cannot alone support prima facie causation).  Cf. González-Droz v.

- 21 -

González-Colón, 660 F.3d 1, 17 (1st Cir. 2011) ("[A]n interval of [fourteen months] cannot establish the necessary linkage between protected speech and some challenged action."). This is especially so given their responses to her emails, which indicated that they were checking on the temperature issues and working to resolve them. Neither expressed any hint of resentment or agitation towards Salmon for providing this notice, and there is no evidence that these notices were considered by either Fredette or McPhee in connection with Salmon's transfer applications.

Moreover, the fact that Fredette and McPhee attended the December 5 School Committee meeting to "show support" for their colleagues, Lang and Tobin, similarly falls short of demonstrating retaliatory motive. Although the meeting was "heated," neither McPhee nor Fredette spoke or otherwise actively participated, and the meeting itself did not involve either of their schools, students, or staff. As McPhee recalled, he and Fredette simply "sat and watched." Salmon presents no evidence to discredit this passive characterization.

As the district court aptly determined, the heating complaints, the School Committee meeting, and Salmon's unsuccessful transfer applications are merely "dots that defy connection." Salmon, 2021 WL 294512, at *7. There is no evidence that Fredette's and McPhee's passive show of support for Lang and Tobin, or their general awareness of Salmon's union advocacy at

Harrington, had any influence on their hiring decisions many months later. To the contrary, it is undisputed that neither McPhee nor Fredette discussed Salmon's transfer applications with Lang or Tobin prior to their denials. They both only spoke with Lang about Salmon's applications upon Lang's request, after Salmon requested to meet with Lang following their denials. There is also no evidence that Salmon's status as union president or past advocacy efforts was ever discussed or considered by Fredette, McPhee, or their school's respective hiring committees in connection with their hiring decisions. Instead, the evidence firmly establishes that these decisions were based on Salmon's interview performance and lack of specialized skills and experience in the eyes of the hiring committees. In sum, there is simply no factual basis to support a plausible inference that Salmon's transfer denials were motivated by any of her union advocacy efforts between 2016 and 2017. Cf. Air Sunshine, Inc. v. Carl, 663 F.3d 27, 35-36 (1st Cir. 2011) (affirming dismissal of retaliation claim for lack of causation, where no plausible connection between permit denials and plaintiff's critical comments of defendant's co-worker).[10]

_____

[10] Because Salmon has failed to make a prima facie showing to satisfy the third prong of her retaliation claims against Fredette and McPhee, our analysis must stop here. We need not consider whether Fredette and McPhee carried their burden, under Mt. Healthy, of showing non-retaliatory reasons for denying Salmon's applications. As a result, we need not consider Salmon's arguments that external applicants had rarely been hired over internal-transfer applicants and that McPhee violated the CBA due to the

- 23 -

## 4.    No Adverse Action As To Claims Against Tobin

Salmon also challenges the district court's determination that she failed to establish that Tobin took any adverse employment action against her. On appeal, Salmon does not contend that any of Tobin's actions were materially adverse when considered individually, but instead asserts that the court applied the wrong standard in considering the collective weight of those actions and concluding that they "[did] not meet the legal test of a hostile work environment." Salmon, 2021 WL 294512, at *6. Again, the district court's analysis was sound, and we adopt its analysis.

As the district court aptly recognized, "the 'adverse employment action' inquiry in the section 1983 context focuses on whether an employer's acts, viewed objectively . . . would have a

---

process in which her application was considered. Although we have said that "[d]eviation from established policy or practice may be evidence of pretext," Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 29 (1st Cir. 1998), such a deviation is, of course, only "relevant to [plaintiff's] burden of demonstrating pretext." Id. (addressing pretext in the ADEA context); see also Dunn v. Trs. of Bos. Univ., 761 F.3d 63, 73 (1st Cir. 2014) (fact of a "deviation from established policy" is only relevant to question of whether defendant's "stated reasons . . . are in fact pretext for discriminating against [plaintiff]"). Here, the issue of pretext is irrelevant, because Salmon has wholly failed to demonstrate but-for causation in the first instance. See, e.g., Vega-Colón v. Wyeth Pharms., 625 F.3d 22, 28 (1st Cir. 2010) (noting, in the employment-discrimination context, that the "inner workings" of defendant's hiring processes "are not relevant, so long as [plaintiff's] status was not a motivating or substantial factor in [the] decision not to hire him").

chilling effect on the employee's exercise of First Amendment rights" that is tantamount to "substantial pressure." Barton, 632 F.3d at 29; see also Alston, 997 F.3d at 49; Salmon, 2021 WL 294512, at *6 (quoting Barton, 632 F.3d at 29). Thus, the "pertinent question" is whether the defendant's actions "would deter 'a reasonably hardy individual[]' from exercising his constitutional rights." Alston, 997 F.3d at 49 (alteration in original) (quoting Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc) (noting that defendant's action must be "sufficiently severe" to have this effect)). We have recognized that "[a] campaign of informal harassment," or "[e]ven 'relatively minor events[,]' can give rise to § 1983 liability so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights." See Barton, 632 F.3d at 29; Rosario-Urdaz v. Velazco, 433 F.3d 174, 179 (1st Cir. 2006) (stating that a "substantial campaign of harassment, instigated or knowingly tolerated by superiors," can form the basis for a § 1983 claim); see also Bergeron v. Cabral, 560 F.3d 1, 10 (1st Cir. 2009) ("As a matter of law, the determination as to whether conduct constitutes an adverse employment action must be made based on

- 25 -

objective criteria."), abrogated on other grounds by Maldonado v. Fontanes, 568 F.3d 263 (1st Cir. 2009).[11]

We have also recognized, however, that "not every action . . . that a public employee may dislike constitutes the kind of adverse employment action that can ground a First Amendment retaliation claim. Rather, the adverse employment action must be 'one that affect[s] employment or alter[s] the conditions of the

---

[11] Salmon contends that the district court erred in applying the test for "hostile work environment" utilized in the Title VII retaliation context, which we have recognized is more exacting than the measure of "adverse employment action" in the First Amendment context. See, e.g., Barton, 632 F.3d at 29. In the Title VII context, "to amount to a hostile work environment, the alleged harassment must be 'severe or pervasive,'" in light of (i) "the frequency and severity of the discriminatory conduct," (ii) whether it was "physically threatening or humiliating," (iii) whether it "unreasonably interfered with the employee's work performance," and (iv) "the effect of the conduct on the employee's psychological well-being." See, e.g., Gómez-Pérez v. Potter, 452 F. App'x 3, 9 & n.8 (1st Cir. 2011) (unpublished) (quoting Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 40 (1st Cir. 2003)). "Where an employee cannot establish pervasiveness, she carries the burden to show that the retaliatory harassment was 'so severe that it rendered her work environment objectively hostile and abusive.'" Id. (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 26 (1st Cir. 2002)). We need not tarry on the distinction between these two standards. The district court clearly applied our First Amendment-retaliation standard in analyzing Salmon's claim, notwithstanding some comparative citation to our Title VII precedent and the similar, but less generous, standard used in that context. See, e.g., LaRou v. Ridlon, 98 F.3d 659, 662 & n.6 (1st Cir. 1996) (noting that ADEA case law may be persuasive in analyzing § 1983 retaliation claims, because "[t]he fundamental meaning of 'adverse employment action' should remain constant regardless of the particular enabling statute, given their similar anti-discriminatory purpose.").

workplace.'" See Delaney v. Town of Abington, 890 F.3d 1, 6 (1st Cir. 2018) (alterations in original) (quoting Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010)); see also Agosto-de-Feliciano, 889 F.2d at 1218-20 (holding that plaintiff must show by "clear and convincing evidence" that "the employer's challenged actions result[ed] in a work situation 'unreasonably inferior' to the norm for the position"). "To determine whether changes in a work situation are 'sufficiently severe to warrant the "unreasonably inferior" description[,] the factfinder should canvass the specific ways in which the plaintiff's job has changed.'" Reyes-Orta v. P.R. Highway & Transp. Auth., 811 F.3d 67, 76 (1st Cir. 2016) (quoting Agosto-de-Feliciano, 889 F.2d at 1218)). The plaintiff bears the burden on this question. Id.

Here, Salmon alleges that "Tobin engaged in a series of small but collectively significant actions that would cause a reasonable person not to exercise her First Amendment right." Specifically, Salmon points to Tobin's conduct in October 2017, which consisted of (i) "yelling at Salmon," (ii) "posting the email from the union vice president [about her yelling at Salmon] behind her desk," and (iii) and "ask[ing] Salmon why she was in certain areas of the school."[12] She further points to Tobin's conduct in

---

[12] Any implied assertion by Salmon that this third act amounted to excessive or unwarranted monitoring stretches the record beyond reasonable support. The only evidence she cites for this implied assertion is testimony from Tobin regarding an October 19 encounter

November through January, which consisted of (iv) "refusing to meet on November 22,"[13] (v) asking other Harrington teachers about times in which Salmon had volunteered to help in their classrooms, and (vi) "meeting with teachers in January 2018 and telling staff there was a right way and wrong way to raise concerns." As a result of Tobin's conduct, Salmon alleges that she was "ostracized by her colleagues," without pointing to any evidence. After careful review of the record, we agree with the district court that no reasonable jury could find that the sum of these events would create a "chilling" effect that would deter a reasonably hardy individual from exercising their union-advocacy rights.

While Salmon complains about the actions described above, the record shows that they were not consequential. This conduct by Tobin was at most mild and consistent with her role as Salmon's principal. As discussed above, Tobin yelled at Salmon over the phone, in response to Salmon attempting to "undo" a scheduling change Tobin had made, and later taped the "scathing"

---

with Salmon, in which she "vaguely remember[ed]" seeing Salmon "sitting on the floor talking with a little boy who was upset," and then "ask[ing] her if she was okay, did she need help."

[13] Again, Salmon mischaracterizes the undisputed record. Tobin engaged with Salmon on her request and spoke with her on November 20, 2017. Tobin told Salmon multiple times that she was willing to meet but she was not available on the requested date. No reasonable jury could infer that this was tantamount to a blanket "refusal," as Salmon contends. We therefore do not consider this allegation in our analysis.

- 28 -

email she received regarding the conversation to her file cabinet, where she kept her "to get-to box."[14]  On another occasion, Tobin stopped to ask Salmon if she was okay, after spotting her speaking to an upset student in the hallway.  Although Salmon had raised concerns to Tobin regarding "increased staffing and improved monitoring of students" prior to these events, there is no evidence to support a reasonable inference that the latter had anything to do with the former.  Cf. McGunigle, 835 F.3d at 204 (fact that adverse action happened after protected speech is not alone sufficient to support retaliation claim).  In any event, these isolated examples of Tobin's general supervision over Salmon as a teacher in her school -- even taken collectively -- had no discernable impact on Salmon's work conditions that would deter a reasonably hardy person from continuing to exercise their constitutional rights.  Cf. Alston v. Spiegel, 988 F.3d 564, 577 (1st Cir. 2021) (affirming dismissal of retaliation claim where "two unconnected events described in the [complaint] [could not] plausibly be characterized as a campaign of harassment sufficient to chill the speech of a 'reasonably hardy individual[]'" (quoting Agosto-de-Feliciano, 889 F.2d at 1217)); McKee v. Hart, 436 F.3d

---

[14] Tobin testified that the email was not meant "to be displayed" to others, was posted among calendars and "inspirational poems," and that anyone entering her office would only notice the email if they "pilfer[ed] through" her things. There is also no evidence that the email was disparaging to Salmon in any way.

- 29 -

165, 173 (3d Cir. 2006) ("[C]ourts have not found violations of employees' First Amendment rights 'where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands.'") (quoting Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003).

Moreover, even if it were unusual for Tobin to indirectly supervise Salmon by asking other teachers about her volunteer activity in their classrooms, and even assuming that Tobin's January 2018 comment was a veiled remark directed at Salmon, these collective actions similarly fail to satisfy Salmon's burden. There is no evidence from which one could reasonably find or infer that these "actions result[ed] in a work situation 'unreasonably inferior' to the norm for the position" or would have deterred a reasonably hardy individual. Agosto-de-Feliciano, 889 F.2d at 1218.[15]

_____

[15] Compare Welch v. Ciampa, 542 F.3d 927, 936-38 (1st Cir. 2008) (affirming summary judgment where alleged campaign of "informal harassment" did not result in unreasonable work conditions) and McKee, 436 F.3d at 170-71 (supervisor's three comments criticizing plaintiff's job performance, without more, were too trivial to deter a person of ordinary firmness from exercising First Amendment rights), with Rivera-Jiménez v. Pierluisi, 362 F.3d 87, 94-95 (1st Cir. 2004) (retaliatory harassment, including "denial of special benefits and assignments," was sufficiently adverse to form basis for First Amendment claim), and Coszalter v. City of Salem, 320 F.3d 968, 976-77 (9th Cir. 2003) (campaign of retaliatory acts, including disciplinary investigation, change in duties, and verbal harassment and humiliation, was sufficient to support First Amendment claim).

**B.    MCRA & MWA Claims**

Salmon next challenges the district court's disposition of her MCRA claims against Lang and Tobin and of her MWA claim against the Town of Chelmsford. Her MCRA claims are based on the same conduct by Lang and Tobin discussed above, whereas her MWA claim is based on her 2018 transfer denials, which she contends were motivated by her heating-issue complaints to Fredette and McPhee. We address each in turn, concluding that all three claims fail at the summary judgment stage.

**1.    MCRA Claims**

To prevail under the MCRA, Salmon must show that "(1) [her] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." McGunigle, 835 F.3d at 205 (quoting Bally v. Ne. Univ., 532 N.E.2d 49, 51-52 (Mass. 1989)); see Mass. Gen. Laws ch. 12, § 11H.[16] Whether conduct amounts to threats,

---

[16] In this context, a "'threat' means 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm'; 'intimidation' means 'putting in fear for the purpose of compelling or deterring conduct'; and 'coercion' means 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.'" Thomas v. Harrington, 909 F.3d 483, 492 (1st Cir. 2018) (quoting Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994)).

intimidation, or coercion is assessed under an objective, "reasonable person" standard. See Planned Parenthood League of Massachusetts, Inc. v. Blake, 631 N.E.2d 985, 990-91 (Mass. 1994). Non-physical coercion rarely supports a basis for recovery under the MCRA. See Thomas v. Harrington, 909 F.3d 483, 492-93 (1st Cir. 2018). Where it has, "Massachusetts courts have required 'a pattern of harassment and intimidation.'" Id. (quoting Howcroft v. City of Peabody, 747 N.E.2d 729, 746 (Mass. App. Ct. 2001)) (finding repeated verbal harassment, relocation of work site, and multiple failed attempts to suspend plaintiff without pay and deprive him of benefits supported a MCRA claim)).

Here, we agree with the district court that Salmon has failed to identify any threats, intimidation, or coercion by Tobin or Lang sufficient to support her MCRA claims.[17] As already discussed, Tobin's various actions towards Salmon were too trivial to constitute a pattern of harassment or intimidation sufficient to deter an ordinary person from exercising her freedom of speech.

---

[17] This assumes that the alleged "interference" was interference with Salmon's continued exercise of her constitutional rights, i.e., union advocacy. Salmon does not specifically address this point. To the extent she claims that the interfered-right was her right to be free from First Amendment retaliation, her claim fails for the independent reasons discussed above, as evidence was insufficient to show causation for the retaliatory claim against Lang, or any adverse employment action for the claim against Tobin. See McGunigle, 835 F.3d at 205 (affirming summary judgment against MCRA claims where evidence was insufficient to prove his § 1983 retaliation claim).

Salmon's conclusory allegations to the contrary cannot save her claim. See Canney v. City of Chelsea, 925 F. Supp. 58, 70 (D. Mass. 1996) ("[M]ere recitals of boilerplate claims of 'threats, intimidation, or coercion' do not meet the requirements of [MCRA] pleading." (citing Hobson v. McLean Hosp. Corp., 522 N.E.2d 975, 978 (Mass. 1988))).

For her claim against Lang, Salmon points only to his request to have her escorted from the school building by a plain-clothes officer following the November 22 incident. Although the district court found, at the motion to dismiss stage, that "allegations that Lang [] directed a police officer to remove her from the school building . . . [i]f proven . . . would amount to intimidation or coercion," Salmon v. Lang, 2019 WL 6496844 (D. Mass. Dec. 3, 2019), evidence of "physical force" or "unwarranted 'heavy-handed use of police power'" was not subsequently developed, see Brunelle v. Lynn Pub. Schs., 183-84, 740 N.E.2d 625, 628-29 (Mass. 2001) (holding that the filing of a criminal complaint is not "intimidation or coercion" within the meaning of the MCRA, where defendant did not use "physical force" or "an unwarranted 'heavy-handed use of police power'").[18] Rather, it is

---

[18] In denying Lang's motion to dismiss Salmon's MCRA claims on this ground, the district court cited only to Batchelder v. Allied Stores Corp., 473 N.E.2d 1128 (Mass. 1985). There, the Massachusetts Supreme Judicial Court ("SJC") held that an "order[]" from a "uniformed security officer" to stop distributing political handbills at a mall was sufficient intimidation or

undisputed that Lang requested the police escort not to punish or deter Salmon from continuing her union advocacy, but to avoid any further disturbance after Lang gave her an opportunity to collect her things and leave on her own. Salmon does not dispute that, as the Superintendent, Lang was authorized to send her home that day. Nothing in the record discredits Lang's explanation that he wanted Salmon to leave before her students arrived, because she was "visibly upset," and that assistance from the police would help expedite her departure. The escort that transpired was discreet and cooperative, as Salmon and a co-worker followed the officer out the back door of the school.

Importantly, there is no evidence that physical force was ever threatened or utilized. Lang's requested escort was simply not the "perp walk" that Salmon alleged in her complaint, and there is no evidence that it caused Salmon to abandon her union advocacy efforts, in any event. See Thomas, 909 F.3d at 493 ("[B]y itself, a threat to use lawful means to reach an intended result is not actionable under [the MCRA]." (alteration in original)

_____

coercion under the MCRA. Id. at 823, 1131. The SJC later clarified, however, that the Batchelder holding "turned on the threat of immediate arrest or forcible ejection implicit within" such an "order." See Glovsky v. Roche Bros. Supermarkets, Inc., 17 N.E.3d 1026, 1035-36 (Mass. 2014). It has since determined that MCRA claims based on police intervention are not actionable without some showing of physical force or an actual and unwarranted threat of arrest, or "other serious adverse consequences." See, e.g., Glovsky, 17 N.E.3d at 1036; Brunelle, 740 N.E.2d at 629. As we discuss, such circumstances are absent here.

- 34 -

(quoting Buster v. George W. Moore, Inc., 783 N.E.2d 399, 411 (Mass. 2003)).  As we have repeatedly stated, "'the exception for MCRA claims based on non-physical coercion remains a narrow one,' and it should not be invoked unless the record 'resembles the sort of physical, moral, or economic pressure that courts have found sufficient to support a claim under this statute."  Thomas, 909 F.3d at 493 (cleaned up) (quoting Meuser v. Fed. Express Corp., 564 F.3d 507, 519 (1st Cir. 2009)); see also Bally, 532 N.E.2d at 53 (explaining that MCRA claims typically require proof of "a threat of serious harm" or physical force).  As with her claims against Tobin, the fact that Salmon "subjectively may have felt 'threatened' or 'intimidated'" by the officer's involvement "does not suffice" to support her MCRA claim.  See Glovsky v. Roche Bros. Supermarkets, Inc., 17 N.E.3d 1026, 1037 (Mass. 2014).  And where the "natural effect" of the defendant's action "could not, and did not, have an impact on the plaintiff[] in the exercise of [a discernable] right," as is the case here, an MCRA claim cannot survive.  See Brunelle, 740 N.E.2d at 628-29.

## 2.  **MWA Claim**

Having found above that Salmon has adduced insufficient facts to survive summary judgment on her § 1983 claims against Fredette and McPhee, we can make short work of her MWA claim against the Town of Chelmsford.  To prevail under the MWA, Salmon must prove that (1) she "engaged in an activity protected by the

- 35 -

[MWA]," such as the disclosure of an unlawful or unsafe activity, policy, or practice of her employer; "(2) the protected activity was the cause of an adverse employment action, such that the employment action was retaliatory; and (3) the retaliatory action caused [her] damages."[19]  See Edwards v. Commonwealth, 174 N.E.3d 1153, 1166 (Mass. 2021) (citing Mass. Gen. Laws. ch. 149, § 185 (b)).  To establish causation under the second element, a plaintiff must show that a retaliatory animus "was a 'determinative' or 'but for' cause of an adverse employment action, even if it was not 'the only cause.'"  Edwards, 174 N.E.3d at 1168-69 (quoting Lipchitz v. Raytheon Co., 751 N.E.2d 360, 371 n.19 (Mass. 2001)).

Here, Salmon contends that her complaints of classroom-temperature issues in 2016 and 2017 -- which she "reasonably believe[d] pose[d] a risk to public health [or] safety," see Mass. Gen. Laws ch. 149, § 185(b)(1) -- were a "substantial and motivating factor" in the 2018 denial of her transfer requests by Fredette and McPhee.[20]  As discussed in some detail above, however,

_____

[19] Additionally, "to qualify for protection under section 185(b)(1), . . . an employee must first 'br[ing] the activity, policy or practice . . . to the attention of a supervisor of the employee by written notice and . . . afford[] the employer a reasonable opportunity to correct the activity, policy or practice." Pierce, 741 F.3d at 303 (alterations in original) (quoting Mass. Gen. Laws ch. 149, § 185(c)(1)). The defendants do not make any argument with respect to this requirement.

[20] We have previously observed that "a plaintiff's burden of proof under the MWA closely parallels his burden for First Amendment discrimination under Mt. Healthy." See Pierce, 741 F.3d at 303. More recently, however, the SJC has clarified that the

- 36 -

she has failed to adduce sufficient evidence that this activity was a "but for" cause of her transfer denials.  Accordingly, her MWA claim fails.[21]

## C. Defamation Claims

Lastly, Salmon challenges entry of summary judgment with respect to two allegedly defamatory social media comments made by Moses, a School Committee member.  In a string of Facebook posts among community members discussing the November 22 incident, Moses wrote that "[Salmon] called [Tobin] a coward," and that "[Salmon] brought [Blanchet] into a school building, without permission, who

---

"determinative cause standard," which is applicable in employment discrimination cases under Mass. Gen. Laws ch. 151B, § 4, should be used to assess MWA claims in lieu of the "substantial or motivating factor" standard used under federal law.  See Edwards, 174 N.E.3d at 1168.  For the purposes of Salmon's case, we need not consider the potential differences between the respective state and federal standards.  Under either formulation, Salmon is required to produce evidence that her protected activity was a "but for" cause of the adverse employment action taken against her.  Compare Edwards, 174 N.E.3d at 1169 ("[A] 'determinative cause' of an adverse employment decision is a 'but for' cause."), with Davignon, 524 F.3d at 106 (explaining that under Mt. Healthy, "the plaintiff must [first] show that the employer would not have taken adverse action but for the plaintiff's speech") (emphasis added).  In this respect, the parallel between the two standards remains apparent.

[21] Because Salmon's MWA claim fails for lack of causation, we need not consider whether the district court erred in determining that her MWA claim independently fails because her heating-issue disclosures did not amount to a disclosure of an employer practice "in violation of law."  Salmon, 2021 WL 294512, at *8.  That said, we note that her disclosures might support a MWA claim as a "practice . . . the employee reasonably believes poses a risk to public health, safety, or the environment."  Mass. Gen. Laws ch. 149, § 185(b)(1).

then assaulted a staff member while children were in the school." The district court disposed of these claims on the grounds that neither statement was actionable as defamation, finding that the first was "substantially true" and that the second was not "of and concerning" Salmon. See Salmon, 2021 WL 294512, at *8-9. For the reasons discussed below, we agree with the district court's assessment of the first of these statements and affirm its holding as to the second on alternative grounds. See McGrath, 757 F.3d at 25.

To prevail on a claim of defamation under Massachusetts law, a "plaintiff must establish that the defendant published 'a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss.'" Zeigler v. Rater, 939 F.3d 385, 392 (1st Cir. 2019) (quoting White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 (Mass. 2004)). "[T]o be actionable, the statement must be one of fact rather than of opinion." Scholz v. Delp, 41 N.E.3d 38, 45 (Mass. 2015); see King v. Globe Newspaper Co., 512 N.E.2d 241, 243 (Mass. 1987) ("Statements of pure opinion are constitutionally protected."). Similarly, "'[s]tatements that are merely "rhetorical hyperbole," or which express a "subjective view," are not statements of actual fact.'" Lawless v. Estrella, 160 N.E.3d 1253, 1257 (Mass. App. Ct. 2020) (quoting Kelleher v. Lowell Gen.

Hosp., 152 N.E.3d 126, 132 (Mass. App. Ct. 2020)). "Whether a statement is a factual assertion or an opinion is a question of law 'if the statement unambiguously constitutes either fact or opinion,' and a question of fact 'if the statement reasonably can be understood both ways.'" Scholz, 41 N.E.3d at 45 (quoting King, 512 N.E.2d at 244). A factual statement must also either be false or made with "actual malice" to support a claim. See Noonan v. Staples, Inc., 556 F.3d 20, 26 (1st Cir. 2009). But it "need not state the precise truth" to be nonactionable. Reilly v. Associated Press, 797 N.E.2d 1204, 1211 (Mass. App. Ct. 2003) (citing Dulgarian v. Stone, 652 N.E.2d 603, 607 (Mass. 1995)). "When a statement is substantially true, a minor inaccuracy will not support a defamation claim." Lawless, 160 N.E.3d at 1257-58 (quoting Reilly, 797 N.E.2d at 1211). See Noonan, 556 F.3d at 28 (noting that, under Massachusetts law, an alleged defamatory statement that is "substantially true" is nonactionable).

1.  **Statement #1: "[Salmon] called [Tobin] a coward."**

First, Salmon contends that the district court erred in finding that Moses's first comment -- i.e., "[Salmon] called [Tobin] a coward" -- was "substantially true." To be sure, this statement is technically false. Salmon did not call Principal Tobin a coward, but instead told Reese that her "unwillingness to have a conversation about solutions [was] cowardly." However, we agree with the district court that, notwithstanding this "minor

inaccuracy," see Salmon, 2021 WL 294512, at *8, the "tenor" of Moses's account of Salmon's email was substantially true, particularly "when considered in the context in which it was [made]," as we must, see Dulgarian, 652 N.E.2d at 607.

Indeed, Moses's statement was made in response to a question from another commenter regarding the "supposed process" used to address teacher concerns in a case in which "the Principal refuses to even meet." Moses replied that "the Principal offered to meet directly with the teacher. After [Salmon] called her a coward, of course."

Salmon has not expressly articulated how this remark could cause her reputational harm. Assuming it could,[22] Salmon calling her school's principal a "coward" in this context has the same defamatory effect as her calling any other school official "cowardly." See, e.g., Veilleux v. Nat'l Broad. Co., 206 F.3d 92, 108 (1st Cir. 2000) ("Where a defendant alters a speaker's words but effects no material change in meaning, the speaker suffers no injury to reputation that is compensable under the law of defamation." (citing Masson v. New Yorker Mag., 501 U.S. 496, 516 (1991))). In either case, the only apparent defamatory effect is that Salmon expressed contempt or disrespect towards the school

---

[22] For instance, Massachusetts courts have found that "[s]tatements suggesting that one lacks a necessary professional characteristic are defamatory." Reilly, 797 N.E.2d at 1216.

officials with whom she had requested to meet. To which official she specifically directed this insult is not material to how a reasonable reader would understand Moses's statement describing it. Cf. Locke v. WHDH-TV, Inc., 22 N.E.3d 177 (Table), 2014 WL 7334096, at *1-2 (Mass. App. Ct. Dec. 23, 2014) (unpublished) (affirming summary judgment where the "gist and defamatory sting of [plaintiff's] actions . . . and [defendant's statements describing them] were substantially similar"); Waters v. Kearney, 173 N.E.3d 57 (Table), 2021 WL 3671276, at *5-6 (Mass. App. Ct. Aug. 19, 2021) (unpublished) (statement that plaintiff was "found not guilty," where, in fact, the charges against him were dismissed, was "substantially true" and could not support a defamation claim); Boyle v. Cape Cod. Times, 959 N.E.2d 457 (Table), 2012 WL 28661, at *2 (Mass. App. Ct. Jan. 6, 2012) (unpublished) (affirming summary judgment on defamation claim based on finding of "minor factual discrepancies"). Thus, summary judgment as to this statement was appropriate where Salmon "had no reasonable expectation" of proving the statement to be materially false. See Dulgarian, 652 N.E.2d at 607.[23]

---

[23] Salmon argues that the question of whether a statement is substantially true, even if technically inaccurate, is only relevant in the context of the "fair reporting privilege," which no one suggests applies here. See, e.g., Elm Med. Lab'y, Inc. v. RKO Gen., Inc., 532 N.E.2d 675, 678 (Mass. 1989) (explaining that the "fair reporting privilege" allows news media "who fairly and accurately report certain types of official or governmental action to be immune from liability for claims arising out of such

2.  **Statement #2: "[Blanchet] assaulted a staff member while the children were in school."**

Next, Salmon argues that the district court erred in finding that Moses's comment that Blanchet "assaulted a staff member while children were in school" was not "of and concerning" Salmon, and therefore not actionable. She argues that the district court took this statement out of context, and that the full context of the statement -- and full chain of posts, which at times refer to Salmon by name -- make clear that Salmon was identified as the person who brought Blanchet into the building, i.e., "[a] Union Officer brought a Union Representative into a school building,

---

reports"); see also Jones v. Taibbi, 512 N.E.2d 260, 266 (Mass. 1987). Her argument is unavailing, as Massachusetts courts have separately recognized, outside the fair-reporting context, that "a minor inaccuracy will not support a defamation claim" when a statement is substantially true. See, e.g., Reilly, at 79 N.E.2d at 1210; see also Murphy v. Bos. Herald, Inc., 865 N.E.2d 746, 754 n.10 (Mass. 2007) (approving jury instruction for defamation claim stating that "minor errors that do not change the readers' understanding of its words, do not make the statement false"); Dulgarian, 652 N.E.2d at 607 (affirming summary judgement for defamation-defendant despite minor factual inaccuracies where the statements were "essentially correct" and the "tenor of the report was accurate," when "viewed as a whole"). This is also consistent with more widely recognized principles of defamation law. See, e.g., Masson, 501 U.S. at 517 ("[A] statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." (internal quotes and cites omitted)); Restatement (Second) of Torts § 581A cmt. f (1977) ("[I]t is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance.").

without permission, who then assaulted a staff member while children were in the school."

As an initial matter, we agree with Salmon that this statement could be reasonably understood to refer to her. See, e.g., Yong Li v. Yanling Zeng, 159 N.E.3d 199, 203-04 (Mass. App. Ct. 2020) (explaining that the "of and concerning" test is met if readers of statement "could reasonably interpret the defendant's words to refer to the plaintiff" (quoting ELM Med. Lab'y, Inc. v. RKO Gen., Inc., 532 N.E.2d 675, 679 (Mass. 1989))). A reasonable jury could conclude that Moses's comment was, at least tangentially, "of and concerning" Salmon, insofar as it identifies involvement of "[a] union leader" that brought an alleged "assault[er]" into the building. In an earlier comment, Moses referred to the teacher who demanded the meeting as "Jen," and other commenters in the chain of posts had previously referred to the "union leader" as "Ms. Salmon." Given the full context of the Facebook-comment thread and the audience, Salmon was readily identifiable from Moses's use of "union leader." See, e.g., Reilly, at 797 N.E.2d at 1215-16 (jury could reasonably find that defamatory statements not expressly "aimed" at the plaintiff "could be understood to 'hit' [him]" through innuendo and "interlaced . . . references to [the plaintiff]").

Summary judgment in Moses's favor is still appropriate, however, because the false, factual components of this statement

are not defamatory as to Salmon. "[W]hether a communication is reasonably susceptible of a defamatory meaning, is a question of law for the court." Phelan v. May Dep't Stores Co., 819 N.E.2d 550, 554 (Mass. 2004). In determining whether a statement is factual or inactionable opinion, a court must "examine the statement in its totality in the context in which it was uttered or published," and "must consider all the words used, not merely a particular phrase or sentence." See Scholz, 41 N.E.3d at 45-46 (quoting Cole v. Westinghouse Broad. Co., 435 N.E.2d 1021, 1025 (Mass. 1982)). Relevant factors to consider include "the specific language used," "whether the statement is verifiable," "the general context of the statement," and "the broader context in which the statement appeared." Id. at 46 (quoting Milkovich v. Lorain Journal Co., 497 U.S. 1, 9 (1990)). "If it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, the statement is not actionable." Id. (cleaned up). Where facts are mixed with, or offered to support an opinion, those facts must be defamatory as to the plaintiff to be actionable. See id. at 49 (concluding that recitation of stress-inducing events that preceded a man's suicide were factual, but not defamatory to the plaintiff that purportedly caused those events, and therefore not actionable); McKee, 874 F.3d at 61 ("[An opinion] is 'immunized' so long as the speaker

- 44 -

discloses all of the facts undergirding it and none of them are both false and defamatory[.]").

Here, Moses's comment must be looked at in its entirety.[24]  See, e.g., Cole, 435 N.E.2d at 1025.  Although it contains factual assertions that are either disputed -- i.e., that Blanchet "assaulted" Tobin -- or perhaps overstated -- e.g., "while children were in the school" -- these statements are not defamatory as to Salmon.  See Scholz, 41 N.E.3d at 45-46, 49; Yohe v. Nugent, 321 F.3d 35, 40-41 (1st Cir. 2003) ("[I]naccuracy by itself does not make a statement defamatory.").  The only defamatory

_____

[24] Moses full comment, made in the context of a discussion about the November 22 incident, consisted of the following:

> I want to be clear.  A Union Officer brought a Union Representative into a school building, without permission, who then assaulted a staff member while children were in the school.  The secretary was so scared she was whispering for help into the phone when she answered a call at her desk.  The busses had to be routed around police cruisers so the children could go into the school.  Not a single care has been given to Mrs. Tobin, an 18 year teacher and 18 year principal in Billerica. None.  Not a single thought has gone into how SERIOUS a danger your children could be in from the actions of an adult who tried to bully a woman.  The Union has no rights for administrative process, or to confidential information.  And in demanding it and not following the rules there was actual, real danger brought into the Harrington Hallways.  Then, on Chelmsford News I stood by while people turned a 6 year old boy into a mythical monster in order to excuse all of the above actions. There was enough information in those discussions to single out a child (and yes, some people figured out who the child is).  I want you all to think about that, a 6 year old was outed to excuse a mistake.

- 45 -

connotation that Salmon reasonably alleges is that the comment implies Salmon was responsible for bringing this "assaulter" into the school and endangering children. The fact that Salmon brought Blanchet into the school is indisputably true. As is the fact that at least Salmon's children were in the building at the time. The implication that Salmon was responsible for Blanchet's ensuing conduct is pure opinion. It reflects Moses's "subjective views" as to the sequence of events, potential danger posed to staff and students, and Salmon's blameworthiness. It is not a "verifiable fact[]." See Scholz, 41 N.E.3d at 46; Lawless, 160 N.E.3d at 1257 (statements of "rhetorical hyperbole, or which express a subjective view are not statements of actual fact" and are therefore not actionable as defamatory (internal quotes and cites omitted)). Cf. Greenbelt Co-op. Publ'g Ass'n v. Bresler, 398 U.S. 6, 13-14 (1970) (holding that use of the word "blackmail" to describe plaintiff's negotiating position could not be understood as a statement of fact); Reilly, 797 N.E.2d at 1213-14 (statement "suggesting" that third party "suspected" plaintiff was "responsible" for a missing medical file was protected opinion based upon disclosed nondefamatory fact that the file was indeed missing). Read in its full context, Moses's statement, at most, amounts to his own "personal conclusions about the information presented." See Piccone v. Bartels, 785 F.3d 766, 774 (1st Cir. 2015) (cleaned up) (quoting Phantom Touring v. Affiliated Publ'ns,

- 46 -

953 F.2d 724, 730 (1st Cir. 1992)). Where, as here, "the speaker 'outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the [listener] free to draw his own conclusions,'" a claim of defamation cannot survive. See Piccone, 785 F.3d at 774 (quoting Riley v. Harr, 292 F.3d 282, 289 (1st Cir. 2002)).

### III. DENIAL OF MOTION FOR LEAVE TO AMEND

Next, we turn to Salmon's appeal of the district court's orders denying her requests to have her amended MWA claim "relate back" to the date of original filing, which were raised in a motion for leave to amend and then a motion for reconsideration. The thrust of Salmon's argument is that state relation-back law should have applied rather than the more restrictive rule under Federal Rule of Procedure 15(c)(1)(C). We review both orders for abuse of discretion. See U.S. ex rel. Ge v. Takeda Pharm. Co. Ltd., 737 F.3d 116, 127 (1st Cir. 2013). In so doing, we are mindful that "[t]he granting of a motion for reconsideration is an extraordinary remedy which should be used sparingly." Id. (quoting Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006)) (other quotes and cites omitted). The moving party "must either clearly establish a manifest error of law or must present newly discovered evidence" to warrant such relief. Id. (internal quotes and cites omitted); see also Caribbean Mgmt. Grp. V. Erikon LLC, 966 F.3d

35, 44-45 (1st Cir. 2020).  For the reasons discussed, we find no abuse of discretion.

**A.**

In February 2020, Salmon sought leave to file a second amended complaint ("SAC") to add a new a claim -- under the MWA, against a new defendant, the Town of Chelmsford -- and have it relate back to the original date of filing, June 2019.  Her only argument to justify relation back was that the new claim "arose out of the conduct, transaction, or occurrence set out . . . in the original complaint," citing Federal Rule of Civil Procedure 15(c) without further argument.  Cf. Fed. R. Civ. P. 15(c)(1)(B); see Mot. for Leave to File Second Am. Compl. at 3, Salmon v. Lang, No. 19-cv-11378 (D. Mass. Feb. 19, 2020), Dkt. No. 31.  The district court rejected Salmon's relation-back argument and allowed her motion only insofar as the new claim alleged adverse action occurring within the MWA's two-year limitations period, i.e., back to February 2018.[25]  The district court concluded that Salmon's new claim failed to satisfy the relation-back requirement under Federal Rule 15(c)(1)(C), because it was motivated purely by a new legal theory rather than mistake concerning the proper defendant's identity.  See Krupski v. Costa Crociere, S.p.A., 560

---

[25] As a practical matter, this allowed Salmon to include allegations underlying her transfer-request denials, in summer 2018, but precluded her from seeking redress for other alleged adverse actions dating back to the November 22, 2017 incident.

U.S. 538, 552 (2010) (requirements for relation back under Rule 15(c)(1)(C)(ii) not satisfied where "failure to name the prospective defendant in original complaint was the result of a fully informed decision as opposed to a mistake concerning the proper defendant's identity").

Salmon timely moved for reconsideration under Rule 60, arguing -- for the first time -- that relation back was permitted under Federal Rule 15(c)(1)(A), because the "law that provides the applicable statute of limitations," here Massachusetts, "allows relation back." See Mass. R. Civ. P. 15(c) (allowing for relation back for any claim arising out of the same "conduct, transaction, or occurrence" set forth in original pleading). Salmon also cited several district court diversity cases holding that, under Federal Rule 15(c)(1)(A), the less-restrictive Massachusetts Rule 15(c) "displaces" the more-restrictive Federal Rule 15(c)(1)(C) to allow for relation back of state-law claims, notwithstanding her failure to show mistaken-identity.[26]

---

[26] For instance, in Abernathy v. Dewey, the court held that whether a diversity-plaintiff's "state-law claims relate back is an issue of Massachusetts law," relying, in part, upon our observation, in Morel v. Daimler-Chrysler AG, 565 F.3d 20, 26 (1st Cir. 2009), that "Rule 15(c)(1)(A) 'cements in place a one-way ratchet; less restrictive state relation-back rules will displace federal relation-back rules, but more restrictive state-relation back rules will not.'" Abernathy v. Dewey, 277 F. Supp. 3d 129, 137-38 (D. Mass. 2017); see also Cayo v. Fitzpatrick, 95 F. Supp. 3d 8, 13 (D. Mass. 2015) (same, in diversity case); Labrador v. Indus. Contractors' Supplies, Inc., No. 13-cv-13029, 2015 WL 5737141, at *2 (D. Mass. Sept. 30, 2015) (same, in diversity case).

The district court denied Salmon's motion in a brief written order. The court agreed that the Massachusetts rule was less restrictive, as it granted broader discretion over relation back, but determined that Federal Rule 15(c)(1)(A) does not require a court to apply state relation-back rules in a "non-diversity case . . . when doing so would contradict the terms of Fed. R. Civ. P. 15(c)(1)(C)." See Electronic Order, Salmon, No. 19-cv-11378 (D. Mass. Feb. 25, 2020), Dkt. No. 34. The court went on to distinguish the cases cited by Salmon, finding that their reliance on dictum from our decision in Morel was unpersuasive, particularly in the non-diversity context. Id.; see Morel v. Daimler-Chrysler AG, 565 F.3d 20, 26 (1st Cir. 2009) (observing that Rule 15(c)(1)(A) "cements in place a one-way ratchet; less restrictive state relation-back rules will displace federal relation-back rules, but more restrictive state relation-back rules will not.'"). As the district court aptly noted, the Morel case did not require construction of Rule 15(c)(1)(A) and it did not purport to definitively engage with it. Rather, it determined that Morel's holding was based on a determination that Rule 15(c)(1)(C) "applies in a diversity case notwithstanding the incidence of a more restrictive state rule" because Rule 15(c) is of a "quintessentially procedural nature" and compliant with the Rules Enabling Act. See Morel, 565 F.3d at 24-25 (emphasis added). The district court reasoned that, because Federal Rule 15(c)(1)(C)

imposes "specific limitations governing when 'an amendment changes the party or the naming of the party against whom a claim is asserted'" and Salmon's suit was not premised on diversity jurisdiction, the federal procedural rule controls.  See Electronic Order, No. 19-cv-11378, Dkt. No. 34.  To hold otherwise, the district court determined, would risk neglecting its "inherent power" to "bring about uniformity in the federal courts" and potentially intrude upon the separation of powers embodied in the Rules Enabling Act.  Id. (quoting Hanna v. Plummer, 380 U.S. 460, 472-73 (1965)).

**B.**

"[I]t is settled beyond hope of contradiction that, at least in the absence of exceptional circumstances, a party may not advance new arguments in a motion for reconsideration when such arguments could and should have been advanced at an earlier stage of the litigation."  Caribbean Mgmt. Grp., 966 F.3d at 45; see also Coons v. Indus. Knife Co., 620 F.3d 38, 44 (1st Cir. 2010). Here, Salmon failed to raise any argument involving Rule 15(c)(1)(A) in her original motion to amend.  Instead, she addressed only the "freely given" standard, generally applicable under Rule 15(a), and the discrete requirement under Federal Rule 15(c)(1)(B)-(C) that limits relation back to new claims arising out of the same "conduct, transaction, or occurrence set out . . . in the original pleading."  "We have frequently

emphasized that judges are not obligated to do a party's work for him, 'searching sua sponte for issues that may be lurking in the penumbra of the motion papers.'" Coons, 620 F.3d at 44 (quoting United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992)). "This is particularly true where, as here, the underdeveloped argument raises complexities that defy an easy answer." Id.; see, e.g., Pessotti v. Eagle Mfg. Co., 946 F.2d 974, 977-78, 980 (1st Cir. 1991) (discussing some of the difficulties that arise when a federal court is asked to apply Massachusetts relation back doctrine).

Under these circumstances, we cannot conclude that the district court abused its discretion in denying Salmon's first motion or committed a manifest error of law in rejecting her belated argument on reconsideration. We have not before determined whether Rule 15(c)(1)(A) displaces Rule 15(c)(1)(C) with less restrictive state law. Indeed, it does not appear that any federal court of appeals has. Moreover, even if Massachusetts Rule 15(c) controlled, it is far from manifest that relation-back would still be appropriate in Salmon's case. See, e.g., Berman v. Linnane, 748 N.E.2d 466 (Mass. 2001) (explaining that "factors inform[ing] a decision to permit amendment" include, inter alia, "whether an honest mistake had been made in selecting the proper party"). In declining to engage with these issues sua sponte, the district court acted within its discretion in denying Salmon's motion for

leave.  See U.S. ex rel. Ge, 737 F.3d at 128.  Its subsequent denial of Salmon's motion to reconsider was not "plain[ly] and indisputabl[y]" wrong such that it "amount[ed] to a complete disregard of the controlling law."  See Venegas-Hernandez v. Sonolux Records, 370 F.3d 183, 195 (1st Cir. 2004) (quoting Black's Law Dictionary 563 (7th ed. 1999) (Manifest error)); Guy v. Crown Equip. Corp., 394 F.3d 320, 325 (5th Cir. 2004) (applying the same definition in the evidentiary context).  Because Salmon has failed to clearly establish that the district court committed a manifest error of law, we find no abuse of discretion in its denial of her motion under Rule 60.  See, e.g., Caribbean Mgmt. Grp., 966 F.3d at 45 (declining to inquire into merits of new theory for relief raised for the first time on reconsideration, and holding no abuse of discretion); Coons, 620 F.3d at 44 (holding that plaintiff forfeited Rule 15(c)(1)(A) argument by not raising it in opposition to defendant's post-judgment motion and that it could not "be 'resurrected on appeal'" (internal quotes and cites omitted)).

## IV.  DISCOVERY RULINGS

Finally, Salmon contends that the defendants effected a subject-matter waiver over all attorney-client communications and work product related to the investigation of the November 22 incident by disclosing six attorney-client privileged emails in response to one of Salmon's discovery requests.  On appeal, Salmon challenges the district court's orders denying her motion to compel

further disclosure on this subject and granting a motion to quash a subpoena ad testificandum served on the School Committee's investigating attorney. The defendants argue that disclosure of these privileged materials was inadvertent and that the district court appropriately limited waiver to the contents of the Investigation Report and the attached emails.[27] We review discovery orders for "abuse of [the district court's] considerable discretion." Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 58 (1st Cir. 2010) (quoting Ayala-Genera v. Bristol Myers-Squibb Co., 95 F.3d 86, 91 (1st Cir. 1996). Given the trial court's "broad discretion," Ayala-Genera, 95 F.3d at 91, we will "intervene . . . only upon a clear showing of manifest injustice, that is, where the [district] court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 860 (1st Cir. 2008). Here, we find no error.

Federal Rule of Evidence 502 provides that "waiver extends to an undisclosed [privileged communication or work-product] . . . only if: (1) the waiver is intentional, (2) the disclosed and undisclosed communications or information concern

---

[27] Salmon does not appear to contend that the Investigation Report itself, which was produced, was an attorney-client privileged communication with waiver implications. She focuses only on the six unredacted emails attached to a redacted version of the report.

the same subject matter, and (3) they ought in fairness to be considered together." Fed. R. Evid. 502(a). The key question is whether the waiver was intentional. See Bear Republic Brewing Co. v. Cent. City Brewing Co., 275 F.R.D. 43, 47 (D. Mass. 2011); see also Fed. R. Evid. 502(a) advisory committee notes ("[A]n inadvertent disclosure of protected information can never result in a subject matter waiver."). Moreover, subject-matter waiver is generally reserved for "situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner." Fed. R. Evid. 502(a) advisory committee notes.

Here, the record supports a finding that the defendants' disclosure of the privileged materials was inadvertent. Upon discovering that the unredacted emails had been disclosed, defense counsel notified Salmon's counsel of the "inadvertent disclosure" and requested that the unredacted materials be returned. Salmon asserts that this disclosure was intentional and selective, arguing that the defendants "released certain communications between Lang and the investigators/attorneys to support their defense that they had adequate justification to discipline Salmon for non-retaliatory reasons." But Salmon presents no support for this contention. We find that the court acted well within its discretion in limiting the scope of waiver to the disclosed documents and in granting the motion to quash.

- 55 -

## V.   CONCLUSION

For the foregoing reasons, we **<u>AFFIRM</u>** the judgment below.